UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ELIZABETH A. MARCZESKI    : CIVIL NO. 3:02CV00894(GLG)
   Plaintiff,    :

v.

RICHARD BROWN, ET.AT.,    : MAY 25, 2004
   Defendants.

MEMORANDUM

1.   Plaintiff moves for entry of a summary judgment in favor of the plaintiff and against the defendants on the grounds that there ARE real genuine issues of material facts and the plaintiff is entitled to a judgment as a matter of law. As to the defendants motion to an order of stay any additional discovery until the Court has ruled on any and all dispositive motions that may be made in the case; I object and also do not object. My objection is that the defendants violated my privacy rights in attending mental medical information that is a fraud and is 21 years old. The defendants, should they claim the shield of immunity due to their professional judgment and adequate training in making decisions in exercising good judgment, would not be afforded the shield of immunity due to the defendants lack of adequate training and their exercising poor judgment in making their decisions. It was only recently that the defendants received training in dealing with the mentally ill.

No professional would ever use a 21 year old mental health record to "prove" their case. By CT law and statutes, any mental health record must be up dated every 6 months. I provide to this Court and to the defendants a current and

1

accurate mental health record that is new and correct as to my mental health issue

2. As the defendants will note in Exhibit (F), in looking and reading the record, I suffer from no clinical depression, nor do I need to take any medication. I was observed by a Dr. Pincay of the Dept. of Mental Health and Addiction Services of (DMHAS) which I was referred to upon my false incarceration at Connecticut Valley Hospital (CVH). I was told by Dr. Pincay to get out of the mental health program as the staff at DMHAS have me as being normal and I am not required to be at that or any agency anymore for any mental health condition(s).

3. I have had to return to the DMHAS because of the defendants telling management personnel where I reside that I was mentally ill and management threatened to evict me. The defendants can not claim 1st amendments right of freedom of speech when they (defendants) are broadcasting to the neighborhood, my residence, and others up and down the eastern board, from Ct to Colorado to Texas that I am mentally ill. The act is egregious and is offensive to the sensibilities to the public. I have current and recent mental health documentation stating that I am not mentally ill but do suffer from PTSD (post trauma stress disorder. The defendants were simply persuaded by a Diana Law and a Gena Butler who filed a false police report that I harassed them, when they actually were stalking, harassing, and threatening me. It was Law who furnished (Exhibit D) to the police in which the police (defendants) interpreted to mean that I was incompetent. It merely meant that both Law and I were not doing well as we were unfamiliar with the F.R.C.P.. In misinterpreting Exhibit D, the police and the prosecutor in using misconduct gave the document to a Judge Handy who went by Your Honor's

recommendation that I be sent to CVH which Your Honor did not recommend.

4. The defendants are correct when the issue of mental illness will be a battle. The defendants subpoenaed my medical doctor Rankin who is merely a medical doctor and not a mental health doctor. Since then, the defendants have violated my right to privacy by unsealing a closed mental health record that is being amended to reflect the current mental health document Exhibit (F).

5. I did not sign any waivers nor did I sign any documents in giving my permission to release such false documents created by Dr. Coric who was criminally prosecuted twice for fraud.

6. In speaking to Dr. Coric (who defrauded the VA, medicare, and blue/cross-blue/shield), even he states that any professional would want a current and accurate mental health. All of Coric patients were re-evaluated at the DMHAS in Norwich, CT.

7. While in the Navy, I suffered from witnessing the lost of my room-mate who I lived with for 6 years. I watch her die which I felt was traumatic. My family was also traumatized. She was family. I suffered from major depression as my grandmother died (raised me) 3 months later. I took anti-pressants and got better.

8. The defendants just do not understand that in the very beginning of my arrest, they were persuaded by a Diana Law that I was mentally ill by cut and paste email that was never authenticated. Law's email did not match my email.

9. The defendants have made a stigma of me being mentally ill through second, third and other parties, thus, when I call the people, they simply do nothing to help me because I am mentally ill.

10. The most likely cause of the defendants training of the mentally ill was the result of a civil action in which the New London police sat on a schizophrenic and let him die. The police did not understand or know to call 911.

11. Whether I prove to the defendants that I am not mentally ill will be of not fruitfulness or change, as the defendants refuse to accept the truth. The defendants have fostered a lie for so long, they no longer know what the truth is. I believe the word is to cover up for the false arrest of me, that everything was a mistake. The State of CT and the courts know I am innocent, however, no one wants to bare the blame or burden. Those statute of limitations ran out on the issue of the false arrest, however, I can bare to see how I must tell a Pardon board how sorry I am for a crime I did not do. No one wants to take the responsibility for their actions but CVH does want to blame someone, and the police are most likely on their list.

Respectfully submitted,  
*Elizabeth Marczeski*  5/25/04  
Elizabeth Marczeski  
206 B Nautilus Dr. #104  
New London, CT  
(860) 440-3541

## LISTS OF EXHIBITS

A. LIST OF LOGS OF NEW LONDON POLICE FOLLOWING ME - HARASSMENT

B. NEWS ARTICLE OF THE NEW LONDON POLICE RECEIVING MENTAL HEALTH TRAINING OF 3-20-04

C. ANSWERS TO 1ST AND 2ND WRITTEN INTERROGATORIES

D. RECOMMENDATION BY GOETTEL TO SEND ME TO CVH DOCUMENTATION OF GOETTEL STATING THAT HE NEVER STATED THAT I WAS INCOMPETENT

E. DR. PINCAY (DMHAS) - NO CLINCAL DEPRESSION - NO MEDS

F. DEPT. OF MENTAL HEALTH AND ADDICTION SERVICES RECORD (DMHAS) - CURRENT

G. NEWS ARTICLES OF THE ACTIONS OF THE POLICE WHICH RESULTED IN OTHER CIVIL ACTIONS.

EXHIBIT (A)

LOGS OF POLICE FOLLOWING, STALKING, AND HARASSMENT

Note: that 54NL, 50NL are police license plates numbers which are also displayed on the vehicle. NL69 etc.

1-6-03 - NL69, male, 4:13pm following me home

1-9-03 -NL52, 2 males followed me from Ocean Ave., to Willets and parked in lot at Family Dollar Store watching 58 Montauk Ave. where I was visiting Norma Sligar. 11:31 am

2-20-03 -NL69 7:07pm and NL67 7:15pm both followed me down Ocean Ave.

2-24-03 - unmarked police auto followed me to Cumberland Farms green auto then followed me home.

3----03 Entire month NL parked in parking lot which is private parking lot to paper work. Female

4-13-03 NL69 all over lot 10:30am, vehicle then went to parking lot across the street and almost lost transmission shifting into reverse when NL69 saw it was a dead end 239 Nautilus Dr.

4-18-03 NL auto went racing through lot, then went up to Gull Harbor, then sped over the speed limit over speed bumps down Nautilus for no apparent reason.

4-21-03 NL69 and NL59 in lot a 9:26am, trespassing

5-7-03 NL male racing through lot which is private property, trespassing.

5-9-03 NL 69, male followed me from my apt to 58 Montauk ave 11.26am

5-21-03 NL69, NL68 both speeding on Nautilus 3:21pm, 5:50pm, 9:58pm with lights on for no reason.

5-27-03 NL69, NL65 at Sam's convenience store chatting, both males saw me and left.

5-30-03 NL 69 9:15pm sat in auto with light on going no where, trespassing next to dumpster which would be near my truck.

6-11-03 NL 66 trespassing in lot...the police just drive in lot for no reason.

6-18-03 NL59 NL69 had siren on for no reason, black officer stated he is new as I was bar-b-queuing 5:19pm.

1

6-19-03   NL69 in middle of private parking lot, female doing paper work, trespassing, Badge #552

7-6-03    NL157 followed me down Ocean, NL157 was on Willets, followed me to 58 Montauk ave 5:50pm with Norma

7-9-03    NL 3 unknown stopped on Montauk, watched Norma and me take dishes, furniture out of my truck. 3rd NL auto sat in lot at Family Dollar Store. Norma and I looked at the elderly police officer who we did not known but he knew us and both NL police auto's stopped in the middle of Montauk ave to watch us get things out of my truck. They leered at us.

7-25-03   NL police auto's in lot where I live and checking out all cars to see if they are registered. trespassing.

7-26-03   NL 54 and unknown stopped and leered at Norma and me on Montauk ave at 5:30pm. I was getting a coffee maker out of truck for Norma.

8-11-03   NL69 trespassing in parking lot 4:31pm

8-12-03   NL 69 7:32pm trespassing in lot

9-10      I did not observe any frequent NL auto's as I was gone each day for medical appts at the VA Medical Center or other appts such as UCONN

11-11-03  NL 69 in lot at 4:40pm , trespassing

11-18-03  NL69 or 68 putting ticket on car in lot that is private property

11-26-03  NL69 or 68 in lot trespassing

1-04      There is not must activity due to snow in the lot and streets.

2-18-04   NL52 10:28am following me. I saw no officer anywhere. I left the parking lot and NL52 was tailgating me all the way down Ocean. NL52 appears to come out of no where.

3-17-04   Perhaps the date is 17 or 18, I phoned police, a female arrived named Deanna. She has been the only helpful people officer that I have ever spoken. She did not treat me as mentally ill. Listened to my complaint and heard the harassing phone conversation on my answering machine.

I still continue to followed on a daily basis by police who know me but I do not

2

know them. The defendants showed them my picture during the false arrest of me, the defendants gave the location of my residence, and as earlier seen, the police have checked out my truck for emissions, registration or anything else that would have me arrested to prevent any civil issues against them which is my legal right to address the Court with my grievance without being retaliated against.

9/30/02 - Police vehicle 54NL 10:16 pm in parking lot and talking at speed bump - no official business - the parking lot is private property.

9/20/02 - 54NL 9:30am in parking lot.
- Gray undercover vehicle follows me on Montauk
- 50NL 11:45am following me

9/17/02 - Called police at 4:50pm - 64NL showed up. Woman in apt 117A was harassing me with her dog. Officer Song gets the story confused and states a woman who owns no dog was now urinating on my AC.

9/12/02 - 61NL - I was a Norma's Sligar apt visiting. 61NL was stalking me. 54NL was following me on Ocean Ave

9/3/02 - police vehicle in parking lot 12:11am trespassing

9/2/02 - police vehicle in parking lot 1:21pm trespassing

8/21/02 - 54NL 4:37pm - I was going down Ocean ave.. Two police officers were in the police vehicle. Officer in passenger side gave me the signal with his middle "finger" at me.

8/20/02 - 43NL white vehicle in lot to examine license plates on private property. trespassing.

8/16/02 - 54NL Ocean ave, 5:49pm, police gawking at me while at Norma Sligar's apt.

8/14/02 - 54Nl 6:30pm, woman taking down info on my truck such as plate number, and emissions sticker. Trespassing.

8/13/02 - Police vehicle behind my truck at 7:22pm doing paperwork.

3

7/29/02   - police on property 9:23pm

7/25/02   - a police vehicle drives into the parking lot, sees me and backs out
            and continues to drive down Nautilus Dr. after seeing me.

6/14/02   - 57NL, 54NL on property Nautilus Dr. 6:04pm
            60NL  9:34am followed me down Montauk ave
            52NL  1:31pm followed me over to Huntington ave.

3/5/02    - Police parked behind my truck

3/2/02    - Police at 9:17am followed me to Norma Sligar's home.

2/5/02    - Police following me from Nautilus to Granite street.

6/19/01   - Daniel Sligar strangling me, police did nothing until I threaten civil
            action 3:40pm

12/21/01  - Police in lot 54NL and 51NL, trespassing

12/28/00  - Police come to arrest me for having U.S. Marshal serve them the
            civil action

July 1999 - 7th - Dittman called police who came to my apt and wanted to talk
            to a Keith Ibbitson who has a phone in his name in my apt. 10pm

            20th- police shine their lights into my apt, then looked in my apt.,
            at 9:50pm for approx 5 minutes.

            22nd - Two detectives stopped and looked into my apt to gawk
            at 10:20am, and then at 10:35am they came into the bldg.

The police have harassed, stalked, and followed me since the false arrest of me

and the police still continue to violate my right to privacy and continue to

trespass on private property for no "real" and legal reason.

EXHIBIT (B)

1-Edit
**Publication:** Day
**Byline:** By MICHAEL COSTANZA
**Date:** 04/05/2003
**Author:** COSTANZA, MIKE

## Police urge passage of

### Program has taught NL officers to better handle the mentally ill

Hartford -- Two years ago, the New London Police Department became the first in New England to train a team of patrol officers to identify and respond more effectively to the mentally ill. Now the department is urging state lawmakers to expand the training statewide.

Capt. Kenneth Edwards Jr. told members of the General Assembly's Judiciary and Appropriations committees Thursday that the training has reduced the number of violent encounters between the police and the mentally ill. It also has made it easier for police to get help for those with mental disorders instead of sending them to jail.

Officers on New London's "Crisis Intervention Team" rely on their training practically every day, Edwards said, and some have called it the most useful training they've ever had.

"Unfortunately," he added, "when most police officers look into their 'toolbox' for help in dealing with someone with mental illness, they come up empty. Until recently, (police) had received little or no training, and even now what it taught in the academy is best described as cursory."

Edwards spoke in support of legislation that would set up a pilot program for police departments to sign up for training similar to that used in New London. The Department of Mental Health and Addiction Services would create the program and report back to lawmakers on its usefulness by January 2005.

New London created its 12-member team with help from police in Memphis, Tenn., which has emerged as a national model for the program. Memphis developed the training after police grew concerned about violent incidents with mentally ill residents that led to deaths, injuries to officers, lawsuits and distrust toward the police. Today, Memphis police arrest the mentally ill in only 2 percent of calls, compared to a national average of 20 percent.

As trends in mental health care move away from institutionalization toward community-based treatment, police have more and more contact with the mentally ill. New London's training teaches officers how to defuse tense situations with disturbed residents, and to develop strong ties with mental-health advocates who can help those people.

"The training should also help police to identify when they are being lured into a possible 'suicide by cop' situation," said Louise Pyers, president of the Connecticut Alliance to Benefit Law Enforcement, which also supports the legislation. Police also learn how to control violent people with words instead of force, or with less lethal force.

The pilot program should cost little and could save money for the state by keeping mentally ill people out of jail, said Sheila Amdur, president of the Connecticut chapter of the National Alliance for the Mentally Ill.

"This is a criminal act to warehouse sick people in our prisons because we have failed to develop community health programs to serve them," Amdur told lawmakers. "We are not saving money. We are merely transferring responsibility from the mental healthcare system to the criminal justice system at greater cost."

Officials from the state Board of Parole also offered support for the legislation. Besides training police to deal with the mentally ill, the bill also would establish pilot programs to help people with psychiatric disabilities comply with the terms of their parole and probation -- in the hopes of keeping them out of jail.

Lawmakers considered the legislation at an informational hearing on bills meant to reduce overcrowding in Connecticut's prisons. Gov. John G. Rowland told the committees that he supports proposals to provide treatment and rehabilitation for non-violent offenders as an alternative to serving time in prison.

m.costanza@theday.com

**Department:** REGION
**Docname:** POLICE 177944
**Byline-Title:** Day Staff Writer
**Last Edit Date:** 05/04/2003 00:31:49
**Typist:** COSTANZA, MIKE

**Depth:** 11.13
**Docnumber:** 177944
**Wordcount:** 608
**Source:** STORY

1-Edit

**Section:** B
**Credit:** Day Staff Writer
**Datatype:** Text

**Page:** 1
**Zone:** North (NORTH)

1-Edit
**Publication:** Day
**Byline:** By ANDREW RYAN
**Date:** 03/20/2004
**Author:** ANDREW RYAN

## Training Program Aimed At Giving Cops A New Perspective

### Officers, dispatchers given a glimpse of the world of mental illness

**New London** -- On a sunny afternoon last September, police Sgt. Dave Hebert fingered the trigger of his pistol, exhaled, and decided to shoot a man.

Twenty feet away, a 36-year-old from Groton wielding two large kitchen knives and a pair of scissors stood in the middle of Ocean Avenue. His shirt was torn, he was muttering, "Do you want to die today?" and he was moving forward.

Hebert screamed for the man to drop the weapons. But the man kept coming, showing no sign that he'd heard the sergeant.

Time seemed to slow. Hebert thought about his family and death. He aimed and, as he began to squeeze the trigger, remembered a nugget of training about schizophrenics hearing voices. Hebert yelled once more, hoping to break through.

Just before he fired, the man stopped muttering and lowered the blades to his waist. He'd heard Hebert's words -- and he heeded them.

The man threw the knives and scissors into the air so that they rained down, clanking off the curb. He took two steps backwards, spread his arms and lay down on the asphalt.

*

Of the dozens of times Hebert has pulled his gun during his 13 years on the force, it was the first time he resigned himself to pulling the trigger.

"I was at the point of shooting," said Hebert, who found out later that the man had stopped taking his medication for schizophrenia and was in fact hearing voices.

This week, Hebert recounted his experience to about 50 officers and dispatchers during a weeklong workshop at the Southeastern Mental Health Authority in Norwich. The training was designed to teach lawmen about mental illness and how to defuse potentially violent situations.

"What we are doing is trying to give officers the tools that they need to deal with what they are encountering on a daily basis," said police Capt. Kenneth Edwards, who helped organize the workshop. "We try to let them see the person in crisis from the person in crisis' perspective."

Edwards, the Connecticut Alliance to Benefit Law Enforcement Inc. and others tried to immerse officers in the world of the mentally ill. Trainees heard from doctors, patients and, with the aid of computers and headphones, stepped into the mind of a schizophrenic in exercises that simulated hallucinations and voices.

They heard from a Wethersfield officer who shot a 19-year-old man who was in the throes of depression after he led police on a high-speed chase and goaded officers with a champagne bottle. Then Louise C. Pyers, the mother of the 19-year-old, stood up. Her son lived, and she founded the Connecticut Alliance

to Benefit Law Enforcement to help police tackle mental health issues.

The workshop reflects a subtle philosophical shift in police training strategies, Edwards said. Traditionally, officers have been taught to take control of volatile situations with speed and force, demanding that people comply with their instructions. Workshop facilitators, however, taught officers to recognize warning signs and to know when to give troubled souls time and a little space.

John H. Simsarian, executive director of the Southeastern Mental Health Authority, said the vast majority of people suffering from mental illnesses never come face-to-face with a police officer. Still, since the state decommissioned Norwich State Hospital in 1996, New London and other local police departments have faced an increasing number of such cases. Edwards estimates that a third of the calls handled by New London police involve someone in the grips of a mental-health crisis.

In January 2001, city police became the first department in New England and the 10th in the country to launch a Crisis Intervention Team. The department trained 14 officers and a dispatcher to respond to calls involving the mentally ill and to defuse volatile situations. For the last year, Chris Burke, a mental health worker, has gone on patrols with New London officers to lend his expertise.

\*

Edwards and other trained officers from eight Connecticut police departments, including Norwich, Plainfield and Groton City, took part in this week's 40-hour workshop.

"It's a new perspective on humanity," said Antonio Dias, 34, who has been an officer in West Haven for three years. "Before, if somebody was acting crazy, I'd throw them to the ground and put the cuffs on them. Now I'll take the time to talk."

Dias had just finished using a virtual hallucination machine that simulated how difficult a simple bus trip could be for someone suffering from schizophrenia. With goggles and earphones, the machine let officers into the world of the mentally ill.

Hoarse, sinister voices barked in the headphones. Shadows danced outside the bus window. Pigeons swooped low out of the sky and sneered. The voices got louder.

"It seems like it's just not real," Dias said. "You can see people's lips moving but different words are coming out."

Another exercise called "Hearing Voices" -- the nugget that Hebert remembered as he was about to pull the trigger on Ocean Avenue -- had officers don headsets. With a recording of simulated schizophrenic voices grinding in their ears, participants performed such banal tasks as reading magazines in a waiting room or answering rudimentary questions about themselves.

The exercise left some officers disoriented.

"I'm just confused," said Ryan Kelsey, a patrolman from Norwich, shaking his head. "I can't even talk right now."

Cameron Lewis, a dispatcher who has worked in New London for more than 22 years, said the workshop gave him pause.

"It's a different perspective," he said. "When you are taking calls from people, you think about where they are calling from, but you don't get into their world."

a.ryan@theday.com

**Department:** REGION
**Docname:** NL.CIT 331263
**Byline-Title:** Day Staff Writer
**Last Edit Date:** 20/03/2004 01:25:38
**Typist:** ANDREW RYAN

**Depth:** 28.63
**Docnumber:** 331263
**Wordcount:** 961
**Source:** STORY

1-Edit

**Section:** A
**Credit:** Day Staff Writer
**Datatype:** Text

**Page:** 1
**Zone:** North (NORTH)

Print

**EXHIBIT (C)**